1810.
JUNE.

Cockey
vs
Smith

In an action of ejectment it is incumbent on the plaintiff to show a grant of the land for which the action is brought. To prove such grant he must produce the grant, or a copy under seal. This is the general rule, and must be generally adhered to. The cases in which this general rule has been deviated from, and in which secondary evidence has been resorted to for presuming a grant, rest on strong facts and circumstances, evincing an equitable right to the land—an incipient title from the proprietary, and length of possession in conformity thereto——mesne conveyances and wills transmitting the right from the taker-up to the plaintiff

The producing the grant is the first step in deducing title; if that is wanting, and inferior testimony is resorted to for presuming a grant, the foundation must be laid by stating and combining all the facts and circumstances existing in the case, on which the court are to direct the jury to presume and find a grant

To repel the plaintiff's title, the defendant must produce an antecedent grant, or give evidence that such grant had existed; or show an incipient title, or proof that the records of the land office were lost or destroyed, and show a rightful possession accompanying the defendant's title.

Length of possession is the great and leading fact in presuming grants and deeds, and without which no grant or deed can be presumed.

A deed from C to F, (under whom the defendant claimed,) for land which did not appear to have been previously granted, was offered in evidence, and there was no evidence that C was ever in the possession of the land—Held, that if C was ever in possession, he was an intruder, and his deed could not operate to transfer any right to the land; and the entry and possession of F was an intrusion, the land being vacant; and that the deed from C to F, and the certificate of the receipt for the alienation fine endorsed thereon, are not legal and competent evidence

It is the exclusive right of the court to decide on the legality and competency of all testimony offered to the jury

Where two papers, purporting to be copies, made (not under seal,) between 1746 and 1759, by a former register of the land office, of certificates of surveys of two tracts of land, one surveyed in 1695, and the other in 1710, and stated to have been taken from particular record books of that office, but which books could not be found in the office, were offered in evidence, with proof of 40 years exclusive possession of the lands, by the defendant and those under whom he claimed—Held, that the copies, not having been certified by the register under the seal of the land office, and being without date, cannot be read in evidence

It belongs to the court to determine on the legal sufficiency of facts and circumstances which will warrant the jury in presuming and finding a grant

Where the proof was insufficient in law for the court to direct the jury to presume a grant of the land in question from the Proprietary.

## COCKEY'S Lessee vs. SMITH.

APPEAL from *Baltimore* county court. Ejectment for a tract of land called *Franklin's Neglect and Cockey's Discovery*, lying in *Baltimore* county. The defendant, (now appellee,) took defence on warrant, and plots were made. 1. The plaintiff at the trial gave in evidence the certificate and patent of a tract of land called *Franklin's Neglect and Cockey's Discovery*, surveyed on the 14th of January 1802, for, and granted to, *John Cockey*, the lessor of the plaintiff, on the 23d of April 1803. He also gave in evidence that the said tract of land is truly located by him, as his claim and pretensions, on the plots. The defendant gave in evidence that the tracts of land called *Gibson's Forest* and *Warner's Chance*, for which she takes her defence, began, as located by her on the plots, and that the black letter *A* on the plots, is the termination of the third line of Lord *Baltimore's* manor. And also that for forty years now last past, *Thomas Franklin*, whose heir at law the defendant is, and those claiming under him, down to the defendant, to the present time, have been in the actual possession and occupation of parts of the said lands, as located on the plots, claiming the whole, and using and cultivating the parts so located, and that no person, except *Franklin*, and those claiming under him, has ever been known to possess or claim any part of the lands until the lessor of the plaintiff caused the certificate of *Franklin's Neglect and Cockey's Discovery* to be made and returned. She also gave in evidence, that the lands on the west side of the said two tracts as located, were

held and possessed by *John Wilson*, and that the lands on the east side of the said tracts, as so located, were held and possessed by the *Boyce* family, and that the lands lying between *Boyce* and *Wilson's* lands were always deemed and reputed to be the lands of *Franklin*. She also gave in evidence, by *Thomas Jones*, esquire, formerly collector of *quit rents* of the Lord Proprietary, for *Baltimore* county, that from the year 1769, till the expiration of the proprietary government in *Maryland*, during which period *Jones* was collector, *Franklin* paid quit rents for the said two tracts of land, under the names of *Gibson's Ridge* and *Warner's Chance*, and that there is a tract of land in *Harford* county, called *Gibson's Ridge*, containing 500 acres, for which quit rents were paid during the said period by other persons. She also read in evidence two receipts from *Jones* to *Franklin* for the quit rents, one for quit rents of *Gibson's Ridge* and *Warner's Chance*, containing 1056 acres, for one year ending the 29th of September 1771, and the other for one year ending the 29th of September 1774. She further gave in evidence the certificate of a tract of land called *The Valley of Jehosaphat*, lying in *Baltimore* county, upon the head of *Gunpowder* river, and upon the N side of the S branch of that river, surveyed on the 27th of September 1683, for *Richard Smith*, and containing 2500 acres. She also gave in evidence, that the three first lines of the last mentioned tract of land are truly located by her on the plots, and that the termination of the third line thereof is at the little black figure 1 on the plots; and that the true beginning of *Gibson's Forest* is at the said figure; and also that the true beginning of *Warner's Chance* is at the red letter *A* on the plots, and is near to a branch running into the little falls of *Gunpowder*, and that the said branch is truly located by her on the plots. She also gave in evidence a regular descent from *Franklin* to her, as his heir at law. She then offered to read in evidence, for the purpose of showing title to *Gibson's Forest* and *Warner's Chance* in *Franklin*, under whom she claims, a deed from *John Clark* to *Franklin*, bearing date the 2d of August 1765, duly acknowledged according to law on the same day, and recorded among the land records of *Baltimore* county, on the 31st of October 1765, whereby, in consideration of £375 current money, *Clark* conveyed to *Franklin* "all those two tracts or parcels of land lying in

*Baltimore* county, between the north and south branches of *Gunpowder* river, the one called and known by the name of *Gibson's Forest*, originally, on or about the 20th day of October 1695, was surveyed for a certain *Miles Gibson*, beginning at a bounded red oak standing on the side of a hill near a run, supposed to have been bounded for the land of *Richard Smith*, and running thence north east sixty-six perches to the end of the south-west line of his Lordship's manor," &c. containing 720 acres. "The other tract called *Warner's Chance*, originally, on or about the 17th of November 1710, was surveyed for a certain *John Warner*, for 336 acres, beginning at three bounded red oaks standing on a point near the head of a branch descending into the little falls of *Gunpowder* river, the said trees standing on the N W side of the said branch, and runs thence," &c. She also offered to read in evidence a note or memorandum entered in the said records, under the record of the said deed, in page 14 of Liber B, No. P, viz. "See alienation receipt recorded in this book fol. 534;" which memorandum is written by way of interlineation, in a different ink, and a different handwriting from the record of the said deed, namely in the handwriting of *John Beale Bordley*, then clerk of *Baltimore* county court. She also offered to read in evidence the record of a receipt for the alienation fine on the said deed, which receipt is mentioned in the said memorandum, and is recorded among the land records aforesaid in Liber B, No. P, page 534, and is stated to be endorsed on the deed from *Clark* to *Franklin* as recorded in the said book in pages 10, &c. and is as follows, viz. "Received forty-two shillings and three pence sterling, for an alienation fine of the within mentioned two tracts of land, for the use of Lord *Baltimore*, by order of his Lordship's agent *Edw. Lloyd*, esquire.

                                        *John Boyd.*"

She also proved to the jury that *John Boyd*, by whom the said receipt purports to be signed, was, on the 2d of August 1765, and for sometime afterwards, receiver of alienation fines in *Baltimore* county. But the plaintiff objected to the reading of the said deed and record of the said receipt; and the court, (*Nicholson*, Ch. J.) overruled the objection, and permitted the said deed and receipt to be read in evidence to the jury, which was accordingly done. The plaintiff excepted.

2. The defendant then, to show title in *Franklin* and those claiming under him, down to her the defendant, in and to *Gibson's Forest* and *Warner's Chance*, read in evidence a commission from *Benjamin Tasker* and *Benjamin Young*, registers and chief judges of the land office, to *Thomas Jennings*, bearing date the 18th of May 1746, constituting and appointing him chief clerk of the land office. She also gave in evidence, that *Jennings* continued to hold and execute the office of clerk of the land office, under the said commission, until the time of his death, which took place some time in 1759. And also, to prove that some of the records of the land office have been lost, she gave in evidence, that original patents for land have been found in the state of which no record ever could be discovered in the land office, or elsewhere; and that in the year 1776 or 1777, the records of the land office were removed from *Annapolis* to *Upper Marlborough* in *Prince George's* county, where they remained one year and upwards; and that there has been a tradition or report in the land office of the loss of some of its records prior to 1746. She also gave in evidence, that no certificates, warrants or patents, for the tracts of land called *Gibson's Forest* and *Warner's Chance*, or either of them, or of any tracts of either of those names, can be found among the records of the land office, now existing, where they have been repeatedly searched for, and that no such record books as Liber D D, No. 8, or Liber No. 28, do now exist or can be found among the records of the land office, or elsewhere. The defendant then produced two papers, purporting to be true copies from certain books of records in the land office, one called Liber D D. No. 8, and the other called Liber No. 28, certified by the said *Jennings* then clerk of the land office, under his hand as clerk thereof, of two certificates of surveys, one of *Gibson's Forest*, and the other of *Warner's Chance*, the first surveyed for *Miles Gibson* on the 20th of October 1695, and the latter surveyed for *John Warner* on the 17th of November 1710, and describing each of those tracts as they are described in the deed from *Clark* to *Franklin* as herein before set forth. She also proved, by witnesses produced and sworn, who were well acquainted with the said *Jennings*, and with his signature, that the name *Thomas Jennings*, subscribed to the said papers, purporting to be co-

pies of the certificates of *Gibson's Forest* and *Warner's Chance*, are the handwriting and signature of the said *Jennings*, and are also in the handwriting with other copies of land records and patents appearing to have been made and issued by the said *Jennings* while clerk as aforesaid; and she also gave in evidence, that while the said *Jennings* was clerk as aforesaid, another person of the name of *Thomas Jennings* was an assistant to him, and wrote for him in the said office; and she then produced a paper, purporting to be a true copy from a record book in the said office called Liber No. 28, of the certificate of *Gibson's Forest*, similar to the copy herein before mentioned. She also proved by witnesses produced and sworn, which witnesses were well acquainted with the said last mentioned *Thomas Jennings*, and with his signature and handwriting, that the last mentioned paper, and the signature thereto, are in the hand writing and signature of the last mentioned *Jennings*. She also gave in evidence, that *John Lawson*, one of the clerks of the land office, did sometimes, in his official certificates, style himself *Register.* She also gave in evidence, that the body of the last mentioned paper, purporting to be a copy of the certificate of *Warner's Chance*, is in the same hand writing with the body of some patents issued from the land office before the year 1760. The plaintiff then read in evidence certain entries from the proprietary *debt books*, for the years 1754 to 1771, inclusive, whereby it does not appear that the *quit rents* on *Gibson's Forest* and *Warner's Chance* were charged to *Thomas Franklin* on the said debt books. He also offered in evidence by *John Brewer*, that he was, and at present is, an assistant clerk to *John Kilty*, register of the land office, and had for eleven years last past been clerk in the said office, acting for many years in said office as a clerk to *John Callahan*, the register thereof, and that he never heard or understood that any record book belonging to the said office had been lost or missing of late years; he never heard or understood that any record book of said office had been lost during the revolutionary war, or at any period shortly before. That Mr. *Callahan*, now dead, informed him, that he had never seen in the office a reference to a book in the office, which he could not find; that seeing a record book of certificates in the office for a number which he could not find patents, he was some-

times induced to believe a record book of patents might have been lost, but on the whole he thought no book was lost; and that the warrants are all recorded in different books from the books in which the certificates and grants are recorded; and he never heard, nor from many years examination of the records has he any reason to believe, that any record book of warrants was lost. The plaintiff also offered in evidence the certificate and grant of *Franklin's Delight and Ruth's Garden*, surveyed for *Thomas Franklin* on the 1st of October 1729, lying in the fork of *Gunpowder* river, and on the N side of the S branch of said river, on the head of a branch called the *Water Fall* Branch, &c. and that they were truly located on the plots as located by the defendant; and also that the grantee was the same person who is grantee in the deed from *Clark* to *Franklin*. Also the certificate of the tract of land called *Gibson's Ridge*, surveyed the 19th of September 1683, for *Miles Gibson*, lying on the S W branch of *Bush* River; and proved by a witness sworn, aged 61 years, that he has been well acquainted with the last mentioned tract of land for 37 years, and that no person of the name of *Franklin* has held or possessed any part of it during that time. That before 1767 the whole of the said land was possessed by *Thomas Bond*, &c. who were and had been in possession thereof for 45 years and upwards, and held and claimed the same under purchases from *Gibson*. That the said land lies now in *Harford* county, and about 15 miles from where *Franklin* lived. The defendant then offered to read in evidence the said three papers, (copies of the certificates of *Gibson's Forest* and *Warner's Chance*,) to support her title to the land for which she takes defence. To the reading of the said three papers to the jury the plaintiff objected. But the court did permit the said certificates to be read to the jury, to be determined by them whether they were or were not genuine. The plaintiff excepted.

3. The plaintiff then prayed the opinion of the court, and their direction to the jury, that from the evidence the jury are not at liberty, and cannot presume that patents issued for *Gibson's Forest* and *Warner's Chance*. Which opinion the court refused to give. The plaintiff excepted; and the verdict and judgment being against him, he appealed to this court.

1810.
Cockey
vs
Smith

1810.

Cockey
vs
Smith

The cause was argued before CHASE, Ch. J. BUCHANAN, GANTT, and EARLE, J.

*Key* and *Winder*, for the Appellant, cited in their argument on the *first* bill of exceptions, *Peake's Evid.* 70. *Chitty on Bills*, 402. *Owing's vs Norwood's Lessee*, 2 *Harr. & Johns.* 96. *Faulkner vs Eddy's Lessee*, 1 *Binny's Rep.* 188; and *Oneale vs Lodge*, 3 *Harr. & M'Hen* 433. On the *second* bill of exceptions, they cited *Chitty on Bills*, 402.

*Martin, Harper* and *Kell*, for the Appellee, on the *first* bill of exceptions, cited *Gittings's Lessee vs. Hall*, 1 *Harr. & Johns.* 18. *Ford vs Lord Grey*, 6 *Mod.* 44. 11 *Vin. Ab.* tit. *Evidence*, 57, pl. 9. *Lofft's Gilb.* 102, 103; and *Carroll's Lessee v Llewellin*, 1 *Harr. & M'Hen* 164. On the *second* bill of exceptions they cited *Lloyd vs Gordon*, 2 *Harr. & M'Hen.* 254. *Carroll's Lessee vs Norwood*, 4 *Harr. & M'Hen.* 287. *Peake's Ev.* 23. *Vin. Ab.* tit. *Evidence*, 97. *Tolly's Lessee vs Ford*, 1 *Harr. & Johns.* 413. *Boreing's Lessee vs Singery*, 4 *Harr. & M'Hen.* 398. And on the *third* bill of exceptions they cited *Co. Litt.* 6. *Gilb. L. E.* 97, 100. *Hall's Lessee vs Gough*, 1 *Harr. & Johns.* 119; and *Carroll's Lessee vs. Norwood*, 4 *Harr. & M'Hen.* 287.

CHASE, Ch. J. delivered the opinion of the court. In actions of ejectment to recover the possession of land, it is incumbent on the plaintiff to show a grant of the land from the proprietary. To prove such grant he must produce the patent, or a copy under seal. This is the general rule, and must be generally adhered to, because there can be no recovery in ejectment without showing a legal title in the plaintiff, which cannot be done without producing a grant from the proprietary.

The cases in which this general rule has been deviated from, and in which secondary evidence has been resorted to, and admitted, for the purpose of obtaining the direction of the court to the jury to presume and find a grant, rest on strong facts and circumstances, evincing an equitable right to the land—an incipient title from the proprietary, and length of possession in conformity thereto—mesne conveyances and wills, transmitting the right from the taker up to the plaintiff.

In actions of ejectment the producing the grant of the proprietary is the first step in deducing title; if that is wanting, and inferior testimony is resorted to for presuming a grant, the foundation must be laid by stating and combining all the facts and circumstances existing in the case, on which the prayer to the court is to be made for their direction to the jury, to presume and find a grant.

In this case, to repel the plaintiff's title, an attempt is made by the defendant to prove an antecedent grant, without producing it, or giving any evidence that such grant ever existed, without showing an incipient title, or proof that the records of the land office were lost or destroyed, and without showing any rightful possession accompanying the defendant's claim.

Length of possession is the great and leading fact in presuming grants and deeds, and without which no grant or deed can be presumed.

There are no facts stated in the *first* bill of exceptions, by which the right and possession of the proprietary could be divested. It is not stated that *Clark* was ever in possession of the land; and if he was, he was an intruder, and his deed could not operate to transfer any right to the land, for he had no right or interest to transmit; and the entry and possession of *Franklin* under *Clark's* deed, was an intrusion, the land being vacant land. The proprietary continued in possession until the act of confiscation; and the acts for appointing commissioners vested the right to the land, and the actual seisin and possession, in the state, which continued in the state until the grant made to *Cockey*, the lessor of the plaintiff.

The court are of opinion, that the deed from *Clark* to *Franklin*, and the certificate of the receipt for the alienation fine endorsed on that deed, are not legal and competent evidence; and that the court below erred in admitting the same to be read to the jury to show title in the defendant to the land in question, and do dissent from the opinion expressed in the *first* bill of exceptions.

It is the exclusive right of the court to decide on the legality and competency of all testimony, which is to be read or given to the jury; and this court are of opinion, that the court below erred in allowing the three papers, purporting to be copies of certificates for *Gibson's Forest* and *Warner's Chance*, to be read in evidence to the jury, the same not

having been certified by *Thomas Jennings* under the seal of the land office, and the same being without date, and the court below having referred the same to the jury to determine whether they were genuine or not. This court dissent from the opinion expressed in the *second* bill of exceptions.

It of right belongs to the court to determine on the legal sufficiency of the facts and circumstances which will warrant the jury in presuming and finding a patent; and this court are of opinion, that the court below erred in not directing the jury that the proof in this case was insufficient in law for the jury to presume a grant from the proprietary, and they dissent from the opinion in the *third* bill of exceptions.

GANTT, J. dissented from the opinion of this court as to the *second* and *third* bills of exceptions.

JUDGMENT REVERSED, AND PROCEDENDO AWARDED.