JAMES WILSON'S LESSEE AND OTHERS, *vs.* WILLIAM INLOES AND OTHERS.—*December,* 1840.

To enable the lessors of the plaintiff to sustain the action of ejectment, it is essential that they should be cloathed with the legal title and the right of possession, at the time the action was instituted.

By the act of 1745, ch. 9, sec. 10, it was enacted, "that all improvements of what kind soever, either, &c., that have or shall be made out of the water, or where it usually flows, shall, as an encouragement to such improvers, be forever deemed the right, title, and inheritance of such improvers, their heirs and assigns forever." The improvements authorised by that act, were those made by improvers in front of their own lots, not of their neighbours, and the right of improvement, in cases of conflicts between riparian proprietors, arising from the curvature of the shores of our waters, is vested in the elder patent, and not divested by subsequent patent.

The act of 1784, ch. 39, sec. 6, which was intended to make such improvements as had been made in the harbour of Baltimore, a part of Baltimore town, saves to all persons the rights acquired under the act of 1745, ch. 9, sec. 10.

The State has the right to grant the soil covered by navigable waters, subject to the public or common right of fishing and navigation.

For the purpose of protecting the public right of navigation, the Legislature passed the act of 1783, ch. 24, appointing Wardens for the port of Baltimore; and the right to make improvements under the act of 1745, was made subject by the act of 1783, to the jurisdiction of the Board of Wardens, whose permission it was necessary to obtain, before any improvement could be thereafter made into the harbour.

The Board of Wardens, in execution of their duties, established a water line called the Port Wardens Line, beyond which they would not grant permissions.

Where those claiming under an elder patent, obtained permission to improve out to the Port Wardens Line, the intervening fast land made by natural

or artificial causes, in front of their lots, vests in them, though also in fact in front of the land of a junior patentee. ·

The ordinance of the city of Baltimore of 1823, ch. 19, which authorised the corporate authorities to contract with the owners of lots, for filling up the same into the water, and in case of neglect or refusal to contract on the part of the owners, the improvement was to be made at their expense, which was to be a lien on the property, must enure to the benefit of the senior patent, where the city has made the improvement, upon the refusal of the proprietor; and the payment of the cost thereof, by another proprietor claiming under a junior patent, does not divest that right; nor would it be competent to the corporation of Baltimore, to vary rights established in such cases, by the general law.

APPEAL from *Baltimore* County Court.

This was an action of ejectment, brought upon the 28th April 1837, by the appellants against the appellees, for a lot of ground, by metes and bounds, &c. The defendants pleaded *non cul.* and took defence upon warrant.

The plaintiffs, to support the issue on their part, offered in evidence the following admission and agreement. "We hereby agree, that the present plaintiffs are the fee simple proprietors of the lot on the *south* side of *Wilk* street, as described in the deed from *William Matthews,* attorney for *John Brown,* according to its true location, and the defendants are the fee simple proprietors of the lots on *west* side of *Bond* street, between *AliceAnna* and *Lancaster* streets, the leases of which they have located, and that the above admitted facts shall have the same effect, as if regularly proved before the jury."

And also offered in evidence the admission of the defendants, that the patent of "*Mountenay's Neck,*" under which the plaintiffs claim, is older than the patent of "*Fell's Prospect,*" under which the defendants claim. The plaintiffs further offered in evidence from the record book of the city, the following application of those under whom the plaintiffs claim, to the *Port Wardens,* to extend their ground into the water, and also the permission in answer to the same, and likewise a plat with explanations.

The plaintiff further gave in evidence, that after the permission aforesaid, logs were planted along the *Port Warden's line,* from P to W, but by whom they were so planted, the witness

did not know; that the effect of these logs, together with others placed along the said *Port Warden's line*, was to aid the filling up that part of the *Cove*, which lies between the *Port Warden's line*, and the line of *Mountenay's Neck*, located on the plats; and further proved, that *Philip Rogers*, to whom the plaintiffs had given a bond of conveyance of the said ground, cut drains from *Harford Run*, by means of which, at high water, the washings of that stream were carried upon the property between *Aliceanna* street, and the water line of the plaintiff's lot. That the logs continued where they were planted till 1823, when they were covered by the fillings up by the city. The witness further proved on cross-examination, that the water was six or eight feet deep between *Aliceanna* and *Lancaster* streets, when, between *Aliceanna* street and the water line of the plaintiff, the water was shallow, and frequently at low tides, the land between these points was left dry; and that in the opinion of the witness, it would have taken a long time to *have* filled up and made dry land by the alluvion produced by the causes aforesaid, the land between *Aliceanna* street and the water line of the plaintiff's lot. The witness further proved on the part of the plaintiff, that the *City Council* diverted the washings from *Caroline* street, and sent them into *Washington* street, during the last war with *Great Britain*. That in 1810, the washings from *Caroline* street were thrown into *Harford Run*, by the *City Council*; that the washings of said street, naturally run across *Bond* and *Gough* streets, and down *Caroline* street, and went into the basin or cove two or three hundred yards east of *Canal* street. That the effect of the washings of *Harford Run*, was gradually to fill up its banks, and make the waters shallow in its neighbourhood; that the logs between P and W, or the *Port Warden's line*, would assist considerably in filling up the land between the *Port Warden's line* and the water line of the plaintiff's land; and proved by a witness, that in his opinion, if these washings had continued to the present time to have run over the lands as they did, before they were thrown into *Washington* street, the land between *Aliceanna* street and the

water line of the plaintiff's lot, would have now been dry land. And further proved, that at full tide the land between *Alice-anna* street, and the water line of the plaintiff's lot, was covered by water up to 1823. In 1812, at *Port Warden's line*, the water was four or five feet deep, and up to *Aliceanna* street the land at low tide would be covered with water. That at moderate tide, the land between *Aliceanna* street and *Fleet* street might be waded by one on foot; at high tide it was covered by water; as low down as *Fleet* street it was nearly fast land in 1823. And further proved, that the *city* of *Baltimore* in 1823, began its improvements, and filled up *East* of *Harford Run*, and commenced on that part of the land in controversy nearest the city dock, and worked backwards towards the water line of the plaintiff's lot, and three or four years ago, they began to fill up the land between *Fleet* and *Aliceanna* streets, *on* which there was then water at high tide, and proved, that the city from 1823, continued to fill up the lands in controversy, and that at the institution the same was dry land. The defendants then gave in evidence by *Foy*, (who had been sworn on the survey,) that he was one of the health commissioners of the *city of Baltimore* from 1820 to the present time; that between 1812 and 1814, the *Mayor and City Council of Baltimore*, commenced making the *south* side of *Lancaster* street, and in 1821 or 1822, they commenced to fill up on the *east* side of *Strawberry Alley*, *south* of *Aliceanna* street. The board of health under the said ordinance of 1823, commenced in 1824, to fill up the lots between *Aliceanna* and *Lancaster streets*, and that of the filling up were paid by the proprietors of the lots on *Bond* street, and that long after the lots of land were re-claimed *south* of *Aliceanna* street, the tide continued to flow above *Aliceanna* and above *Fleet* streets. The defendant also proved by *Robert Graves*, a competent evidence, that in 1807, *William Inloes*, one of the defendants, run out a water fence as designated on the plats by dotted lines from P to G; that the fence caught the wash that came down *Caroline* street, and made the square of ground east of *Caroline* street and south of *Aliceanna* street, firm land; they also prov-

ed by *James Curley*, one of the city commissioners, that the city commenced filling up the property now in dispute, about 1823, and when it was done and fully completed, the board of commissioners made out bills against the owners of the lots on *Bond* street, for the expense of the same, in pursuance of the ordinance of 1823, ch. 19, which bills were paid by defendants, they being said owners; that the city has never been paid by any one for the filling up of the square between *Fleet* and *Aliceanna* streets in *Canal* street. The defendants also gave in evidence the patent of *Fell's Prospect*, bearing date 1761, which was admitted to be correctly located on the plats in the case, so far as the same is located thereon, also, the ordinance of 4th May 1801, ch.    1814, ch.    and 1823, ch. 19, and passed the 11th March 1823, and the act of 1745, ch. 9, and the act of 1783, ch. 24; and also gave in evidence the following admissions of title in defendants. "We hereby agree, that the present plaintiffs are the fee simple proprietors of the lot on the *south* side of *Wilk* street, as described in the deed of *William Matthews*, attorney for *John Brown*, according to its true locations, and that defendants are the fee simple proprietors of the lots on *west* side of *Bond* street, between *Aliceanna* and *Lancaster* streets, the leases of which they have located, and that the above admitted facts shall have the same effect, as if regularly proved before the jury."

And also proved by *Mr. Curley*, that in 1824, the whole ground between *Fleet* and *Lancaster* streets was covered with tide water, and that at this time the tide water flows over a part of the lot above *Fleet* street, and offered in evidence the plats and explanations in this cause. And the defendants also offered to prove, that the board of health under the said ordinance of 1823, commenced in 1824 to fill up the lots between *Aliceanna* and *Lancaster* streets, and that about the time of the completion of the work, the commissioners caused a plat to be made of the property improved, on which the names of the defendants were set down as the parties chargeable with the payment of the sums due for the filling up of the property in dispute in this action; that this plat was prepared about the

time the work was completed, and as witness believes in 1836; and that a part of the work *east* of *Caroline* street having been previously completed, bills for the same had been previously made out against, and paid by these defendants; that the bills for the property between *Caroline* and *Canal* streets, were not presented to or paid by the defendants, until after the completion of the work in 1836; and that the witness stated, that if there were any contracts as to this filling up, they were in writing. To the admissibility of this evidence of the paying by defendants to the city, for the filling up the property in controversy, as any evidence of the contract between the defendants and the city, under the ordinance of 1823, ch. 19, and also as wholly irrelevant to the issue in this case, the plaintiffs objected. But the court, *by consent of the counsel, admitted said evidence pro forma,* and it is agreed, the plaintiff be considered as excepting to the admission of said evidence, and be at liberty to insist on said objection in the Court of Appeals.

Whereupon the plaintiffs prayed the court to instruct the jury. 1st, that if they believe from the evidence, that the plaintiffs were entitled to the property in yellow shaded lines, to the place on the plat, where they are intersected by the line of *Mountenay's Neck.* And if the jury further believe, that from thence the land within said lines to the *Port Warden's line,* marked P. W. has been re-claimed from the water, in in part by the acts of those under whom the plaintiffs claim, in planting logs as stated in the evidence, with a view to improve and fill up their lot, under the permission of the *Port Wardens* of the 28th of September 1786, in part also by the acts of *Rogers,* assisted by the operation of natural causes, and that the *city of Baltimore,* by the concurrence of *Rogers* and the plaintiffs, and under the ordinance of 1823, completed the said filling up at the expense of the plaintiffs, so as to make the said lot fast land, at or before the institution of this suit, then the plaintiffs are entitled to recover according to their pretensions, as far as to the *Port Warden's line;* and if in addition to these facts, the jury shall believe, that the residue of the land claimed by the plaintiffs, was made and annexed by

the said city or their authorised agents, with the concurrence and at the expense of the plaintiffs, to the land within the yellow shaded lines, then the plaintiffs are entitled to recover according to their pretensions.

2nd. If the jury believe, that the Mayor and City Council or their agents, filled up and improved the cove as stated in the evidence under the ordinance of 1823, and charged the different riparian proprietors with the expense of the said filling and improvement opposite to their lots respectively, and if said filling and improvement were completed as far as the plaintiffs are concerned, with their consent and co-operation, then under the true construction of the said evidence, and of the acts of 1745, 1783 and 1784, the extension, filling up, and improvement of the plaintiff's lot, and in front thereof, is virtually their own act, done with the consent and permission of the city authorities within limits described by themselves, and that therefore the plaintiffs have a right as riparian proprietors, to follow out their lot thus extended and and improved, until it reaches the water, according to their pretensions ; which instructions the court (ARCHER, C. J., and PURVIANCE, A, J.,) refused to to give.

The plaintiffs excepted, and brought up this appeal.

The cause was argued before STEPHEN, CHAMBERS, and SPENCE, J.

By ALRICKS and DULANY for the appellants, and
By McMAHON and RICHARDSON for the appellees.

STEPHEN, J., delivered the opinion of the court.

This action of ejectment was instituted to recover a parcel of ground situated on *Fell's Point*, in the *city of Baltimore*, containing six acres, the location of which is particularly designated in the plaintiff's declaration. The defendants in the suit pleaded not guilty, and took defence for a part only of the land claimed by the plaintiff in his declaration ; which defence is particularly described and designated upon the plats in the case. The land in controversy was originally covered

by water, and has since been re-claimed and improved, under the provisions of several acts of Assembly, and ordinances of the *city of Baltimore;* and the question which this court now have to decide, is to whom under the facts and circumstances given in evidence, and the operation of the acts of Assembly, and the true construction of the ordinances upon those facts, the property in litigation in this suit belonged at the period of the institution of this action; for to enable the lessors of the plaintiff to sustain their ejectment, and to recover the land in controversy, it was essential, that they should be clothed with the legal title, and the right of possession at the time the action was instituted. The principle being well settled, that in such suit the plaintiff must recover by the strength of his own title, and not by the weakness of the title of his adversary. It is an admitted fact, that the tract of land called *Mountenay's Neck,* under which the plaintiffs claim, is older than the land called *Fell's Prospect,* under which the defendants claim. The patent for the first bearing date in 1737, and the patent for the last in 1761. The dates of these patents are important, because upon the priority of the grant of *Mountenay's Neck,* to the grant of *Fell's Prospect,* the merits of this controversy will in our opinion very materially depend, when we come to consider, the right or privilege given by the act of 1745, ch. 9 sec. 10, to the holders of the lots in the then town, now *city of Baltimore,* to make improvements in front of their own lots. The language of that act of Assembly is as follows: "that all improvements of what kind soever, either wharves, houses or other buildings, that have, or shall be made out of the water, or where it usually flows, shall as an encouragement to such improvers, be forever deemed the right, title, and inheritance of such improvers, their heirs and assigns forever." We are not called upon now for the first time, to give a construction to this provision of the act of 1745, ch. 9, sec. 10. The court have already settled that question, and performed that duty. In 5 *Gill & John.* 368, where they say, that the improvements authorised by that act, were those made by improvers in front of their own lots, not of their neigh-

bours, the Legislature never designed such invasion of the rights of private property, and indeed in that case, the exercise of such a power by the Legislature, is considered to be questionable, and open to serious objections, even if it should be attempted. It is sufficient for us however in this case to say, that we perfectly concur in the opinion then expressed, that the improvements intended to be authorsed and encouraged by that act, were such as should be made by improvers in front of their own lots; and we moreover think, that the right of improvement given by the act of 1745, vested in the patentee of *Mountenay's Neck*, and was not divested or in any manner impaired by the subsequent grant to the patentee of *Fell's Prospect*. This vested right of improvement is also expressly recognised and confirmed by the act of 1784, ch. 39, sec. 6, which was intended to make such improvements as had been made a part of *Baltimore town*, and to clothe them with all privileges and immunities as such; after performing that office, the section uses the following strong and explicit language: "saving to all persons whatsoever, their right of property in any of the said grounds so made and extended as aforesaid, and in the lots or land from which such ground may be made and extended, and the right to make and extend ground as aforesaid, and the right to the water or the land covered by water, which rights are not meant, or intended, in any manner, to be interfered with, determined on, or affected by this act." In the case of *Bowie vs. Kennedy*, 5 *Harr. & John.* 185, this court established the principle, that the State had the right to grant the soil covered by navigable waters, subject to the public or common right of fishing and navigation, and for the purpose of protecting the public right of navigation from infringement, the Legislature passed the law of 1783, ch. 24, entitled, an act appointing *Wardens* for the *Port of Baltimore town*, in *Baltimore* county. The right to improve given to the owners of lots by the act of 1745, was made subject by that law to the jurisdiction of the *Board of Wardens*, whose permission it was necessary to obtain, before any wharf or improvement could be made, into the harbour or basin of said town. It appears

from the proof in this case, that application was made to the *Board of Wardens* in 1786, by those under whom the plaintiffs claim, to extend their ground into the water, and that permission was obtained to make such extension to a line marked on the plats as the *Port Warden's line*, along which logs were planted, but by whom the proof did not establish. It was further proved, that the effect of these logs, together with others placed along the said *Port Warden's line*, was to aid the filling up of that part of the cove, which lies between the *Port Warden's line*, and the line of *Mountenay's Neck*, located on the plats; and it was further proved, that *Philip Rogers*, to whom the plaintiffs had given a bond of conveyance of the said grounds, cut drains from *Harford run*, by means of which at high water, the washings of that stream were carried upon the property between *Aliceanna* street, and the water line of the plaintiff's lot; that the logs continued where they were planted till 1823, when they were covered by the fillings up by the city. Some further proof was given by the plaintiffs, and also by the defendants, which it is not deemed necessary to state in detail for the purposes of this opinion, as we think that the merits of this controversy depend upon other grounds. We do not think, that the ordinance of 1801, limiting the right of improvement to the *south* side of *Aliceanna* street, by the owners of lots on *Wilk* street, has any material bearing upon the rights of the parties to this suit; as the corporation by whom the improvement in question was made, had full and complete jurisdiction over the subject of that ordinance; and in making the improvement in question virtually repealed and annulled, any restriction or limitation, imposed by that ordinance. The great and leading question in this case is, for whose benefit was the improvement made by the corporation under the ordinance of 1823, ch. 19? In reference to that question the ordinance speaks a language, which cannot we think be misunderstood. The contract was to be made by the corporate authorities, with the owners of the lots, for the filling up of their lots into the water, and in case of neglect or refusal to contract on the part of the owners, the improvement was to

be made at their expense, which was to be a lien upon the property, and the proprietors are also made liable to be sued for the amount of the expense incurred in making such improvement. But it has been strongly argued in this case, that both plaintiff and defendants are riparian proprietors, and that as no provision has been made by law for such a conflict of rights, neither party can claim title to the prejudice or exclusion of the other. But we think, as we have before remarked, that the right vested in the prior grantee under the act of 1745, and confirmed by that of 1784, is paramount to, and must prevail over that of the junior grantee, and that the improvement made by the corporation under the ordinance of 1823, must enure to the benefit of those who claim title under the senior grant. We think moreover, that the improvement or filling up being made for their benefit, under the true construction of the acts of Assembly and the ordinance of 1823, a title vested in them which could not be divested, or in any manner impaired by the fact, that the expense of such filling up or improvement, was paid for by the defendants. It was not competent for the corporation by any act of theirs, so to vary or affect the rights of the parties as established by law. Under this view of the case we think, that the court below ought to have granted the plaintiff's prayers; that they were entitled to recover, although there might have been no sufficient evidence of certain facts upon which in part their prayers were predicated, they having a right to recover independently of the existence of such facts, upon the evidence which they exhibited. We think also, that the evidence relative to the paying by the defendants for the expense of the improvement in controversy was irrelevant, and therefore ought to have been rejected for the reasons which we have already stated, such expense having been paid by them, could not operate to affect or impair the plaintiff's title.

JUDGMENT REVERSED AND PROCEDENDO AWARDED.